**INVISIBLE EMPIRE OF THE KNIGHTS OF THE KU KLUX KLAN, MARYLAND CHAPTER, By and Through Roger KELLY, Grand Dragon, Plaintiff,**

v.

**MAYOR, BOARD OF COMMISSIONERS, AND CHIEF OF POLICE OF the TOWN OF THURMONT, MD., in Their Official Capacities, Defendants,**

and

**National Association for the Advancement of Colored People, Frederick County Chapter, and Lord D. Nickens, Intervening Defendants.**

Civ. No. B–88–2577.

United States District Court, D. Maryland.

Dec. 1, 1988.

Michael D. Berman, Baltimore, Md., Susan Goering, Baltimore, Md., and the American Civil Liberties Union of Maryland, for plaintiff.

Clifford R. Bridgford, Frederick, Md., for defendants.

Michael A. Millemann, Baltimore, Md., and Willie James Mahone, Frederick, Md., and Kathleen A. Ellis, Baltimore, Md., for intervening defendants.

WALTER E. BLACK, Jr., District Judge.

Plaintiff in this action is the Invisible Empire of the Knights of the Ku Klux Klan, Maryland Chapter, represented by Roger Kelly, Grand Dragon. Defendants are the Mayor, Board of Commissioners, and Chief of Police of the Town of Thurmont, Maryland. Intervening defendants are the National Association for the Advancement of Colored People, Frederick County Chapter, and Lord D. Nickens.

On May 27, 1988, the Maryland Chapter of the Invisible Empire of the Knights of the Ku Klux Klan (KKK) applied for a permit to parade on the highways and streets located in Thurmont, Maryland, on August 13, 1988. That application was denied by the Board of Commissioners of Thurmont.

The parade was to be conducted only by members of the KKK and was to be for the purpose of demonstrating the KKK's support of the "Just Say No to Drugs" program and support of the American Association of Retired Persons (AARP). The parade had the further purpose of recruitment of new members; the slogan "Save Our Land, Join the Klan" would be displayed in aid of that purpose. The parade would involve not more than 100 persons, one float, and two or three vehicles.

The KKK's permit request was submitted on a State Highway Administration "Special Event Permit" form. It was ap-

proved by the Maryland State Police. The State Highway Administration, however, will only approve the application if the local police of the Town of Thurmont approve it. The local police will only approve such a permit if authorized to do so by the Board of Commissioners of the Town.

In addition to approving the State permit, the Town must give its own permission and consent in order for the parade to go forward. The policy of requiring the Town's permission to parade is not codified in any ordinance or other written document of any kind. Nor are there any written guidelines governing the Town's consideration of parade requests. Under the Town's procedure, the Town evaluates the applicant and imposes conditions for parading on an individual basis. The Town imposes no permit fees for parades, although permit fees are imposed for other special events on public property in the Town.

Roger Kelly, Grand Dragon and representative of the KKK, appeared before the Thurmont Board of Commissioners at a meeting on June 8, 1988, to request approval of the parade permit. After some discussion, the Commissioners voted to deny the request for the following reasons:

(1) they did not want to set a precedent where many other groups could request to hold parades in Thurmont;

(2) the parade would require the use of all of the Town's police officers and would require time and a half to be paid to these officers;

(3) concern for the safety and welfare of citizens as well as of the KKK members; and

(4) another group, Moore's Business Forms, would be holding a large event on the same day.

The KKK made a subsequent request for the Town's permission for a parade on September 3, 1988, submitting a second permit application. The size and purposes of the parade were the same as before. Kelly again appeared at a meeting of the Town Board of Commissioners on August 3, 1988. At that time, the Board reserved its decision and scheduled a public hearing on this issue for its meeting on August 24, 1988.

Sometime between June 8, 1988, and August 24, 1988, the NAACP informed counsel for the Town of Thurmont that they considered that case law of this Court prohibited the Town of Thurmont from granting permission for the KKK's proposed parade, unless black and/or nongentile persons were allowed to march in that parade. The NAACP informed Town counsel that they would sue the Town if it granted permission without imposing a nondiscrimination condition.

At the special meeting on August 24, 1988, the KKK was represented by the American Civil Liberties Union (ACLU) and Kelly. Concerned about what conditions to impose on the KKK's parade, Town Board members asked Kelly numerous questions relating to the KKK's financial assets, willingness to obtain insurance, membership policies, and history of violence. The Mayor and Board also expressed concern about the discriminatory policies of the KKK. Kelly, counseled by the ACLU, refused to answer many of the questions posed, requesting a permit with no conditions attached. Many members of the public made statements, some of which expressed disapproval of the KKK and its beliefs. The Board took a ten minute recess to decide the issue. It then voted to deny permission for a parade for the following stated reasons:

(1) "We don't know who we are giving this permit to. Granted Mr. Roger Kelly has signed it. We have asked various questions as to who the Klan is, and we have not gotten answers. Who is responsible for damages that may be incurred by the town, for anyone along the parade route?";

(2) "the town facilities and resources are being provided to an organization that appears to be discriminatory to races other than the white race, and also appears to be antisemitic and discriminate against other religions."; and

(3) "you have indicated you will not provide insurance coverage or any hold harmless agreement or reimbursement

of expenses in assisting you with a parade in this town—apparently meaning claiming no responsibility."

Soon after the Board rendered its decision, this lawsuit was filed by the KKK against the Mayor, Board of Commissioners, and Chief of Police of the Town of Thurmont in their official capacities. The NAACP subsequently intervened as defendants in this action to oppose the KKK's attempt to hold public events that exclude the participation of members of the public based on race and religion. Plaintiff consented to this intervention. It is stipulated that "Just Say No To Drugs" and the AARP are matters of interest to the NAACP and that members of the NAACP will seek in the future to participate in any KKK parades in the Town of Thurmont.

On October 4, 1988, the KKK made a third application for a parade, to be held on October 29, 1988, for the same stated purposes as in the prior applications, but, in addition, to commemorate the death of General Nathan Bedford Forrest, founder of the KKK. The Town took the position that it would not process the request until after this litigation was resolved.

It has been stipulated by the parties that while there is a market for parade insurance in Maryland, the insurance industry will not sell insurance to the KKK due to its perceived reputation and perceived fear of disturbance during a parade in Thurmont. The parties have further stipulated that the Town's general liability insurance policy covers parades which are conducted in the Town of Thurmont.

The facts before the Court raise at least three legal issues, which will be addressed in turn:

(1) Is the Town of Thurmont's procedure for processing parade applications constitutional?;

(2) May the Town constitutionally impose any financial conditions upon the KKK in granting their permit?; and

(3) May the Town constitutionally impose a nondiscrimination condition on the KKK's parade?

# I

■ According to the Mayor, an applicant for a parade in Thurmont should come before the Board of Commissioners at a public meeting, present its case, and "it would be decided on in a public meeting by a vote of the commissioners whether [it] would be granted permission to parade or not parade." Further, under the Town's permission process, the Commissioners can choose to impose any conditions they wish on the parade.

There are only two parades which occur with any regularity in the Town of Thurmont—the annual volunteer firefighters parade and the Catoctin High School homecoming parade. The Town, with a population of 3,340, admittedly, is not well-equipped to deal with parade requests from new groups. The two traditional parades clearly receive special treatment from the Town; permission is given to parade without any questions asked or conditions imposed. Neither the firefighters nor the high school receive the scrutiny that the KKK received from the Board of Commissioners. Nor do any other applicants for permission to use Town property receive any degree of scrutiny.

This situation reveals the unfettered discretion of the Board to grant or deny permission to parade in the Town. There are absolutely no written guidelines on the criteria for granting permission to parade, although the Town post hoc "organized [its] concerns into an organized statement" in preparation for the August 24, 1988 meeting. Although no official permit is issued, the permission system of the Town operates as a prior restraint on free speech. If a group paraded without permission, the Town deems that it would have cause to arrest them.

Such prior restraints on freedom of speech are invalid if there are no "narrowly drawn, reasonable and definite" standards to guide officials. *Niemotko v. State of Maryland*, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed.2d 267 (1951). Any limits imposed on the licensing official's discretion must be made explicit—"by textual incorporation, binding judicial or adminis-

trative construction, or well-established practice." *City of Lakewood v. Plain Dealer Publishing Co.,* —— U.S. ——, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988). This standard is not met here—there are no ordinances or regulations which guide the Commissioners in their decisions. Clearly, there are no narrowly drawn limitations. On the contrary, the Town regards its power to impose conditions as limitless. Nor are the Town's criteria embodied in well-established practice. Indeed, the past practice with regard to the two other groups which regularly parade was to grant permission with no conditions and to make no inquiry as to whether conditions were necessary.

The Court finds that the Town's procedure for considering parade requests and conditions to be imposed on such requests is an unconstitutional prior restraint on free speech. The process is extremely vague and vests standardless discretion in the Board of Commissioners to approve or disapprove of parade applications as they see fit. Because of the size of Thurmont and the limited nature of its government, however, the Court does not find that the Town is required to enact a written ordinance; a Town policy could be constitutional under appropriate circumstances, such as if the Town's explicit practice was to grant all parade requests and to impose uniform constitutional conditions on all applicants.

## II

■ The Town sought to impose several financial conditions on the KKK parade. The Town considered conditions of liability insurance, a hold harmless or indemnification agreement, and reimbursement for the cost of police protection and clean-up. This Court finds that, in this case, the Town may not constitutionally impose such conditions.

It is undisputed that government may regulate the time, place, and manner of speech. *See, e.g., Eastern Connecticut Citizens Action Group v. Powers,* 723 F.2d 1050, 1055 (2d Cir.1983). "Prior restraints on speech, even in the form of restrictions rather than prohibition, are heavily disfavored...." *Id.* In public forums, the government's power to impose restrictions on speech is quite limited. Thus, a time, place, and manner restriction is valid only if it is content-neutral, narrowly tailored to serve a significant governmental interest, and leaves open adequate alternative channels for speech. *See, e.g., United States v. Grace,* 461 U.S. 171, 177, 103 S.Ct. 1702, 1706–07, 75 L.Ed.2d 736 (1983); *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984).

Under the facts of this case, the Town's conditions are not narrowly tailored to serve a significant governmental interest. The Town has made no showing that insurance or a hold harmless agreement is even necessary. The Town has admitted that it has insurance which covers parade activity. Further, the Town could more narrowly serve its interest in safety by criminalizing conduct which causes injury to persons or property and by arresting violators of its criminal laws. *Collin v. Smith,* 578 F.2d 1197, 1209 (7th Cir.1978).

It is undisputed that the KKK is unable to obtain special event insurance coverage in Maryland for its parade. Under these circumstances, an insurance condition would prohibit "First Amendment activity, not itself directly productive of the feared injury, by those too controversial to obtain commercial insurance." *Collin,* 578 F.2d at 1209.

Finally, the evidence was uncontradicted at trial that prior Klan activities in Frederick County and the Town of Thurmont have been peaceful and that no violence has been sponsored by the Maryland Chapter of this particular faction of the KKK. The KKK's most recent activity in Thurmont, a "walk-through" on September 3, 1988, where members in their robes strolled along the sidewalks of the downtown area of Thurmont, was entirely peaceful and uneventful. The Town also considered the possibility that spectators would be hostile. This is an impermissible consideration under the Constitution. *See, e.g., Invisible Empire Knights of the Ku Klux Klan v.*

*City of West Haven,* 600 F.Supp. 1427, 1434 (D.Conn.1985).

In sum, the Court is satisfied that there is no justification for insurance or hold harmless conditions to be imposed on the KKK parade and, accordingly, they may not constitutionally be imposed by the Town under these circumstances. However, the Court need not rule on the broader issue of the Town's power to require insurance for parades in the future under other circumstances.

The Town's request for reimbursement for police protection and clean-up is likewise unconstitutional. The cost of police protection may not be imposed on those who wish to exercise their right to freedom of expression. *Id.,* at 1433. *See also Central Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515 (11th Cir.1985), *cert. denied,* 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986). "It is society that benefits by the free exchange of ideas, not only the person whose ideas are being shared. In order fully to preserve and protect the people's right to be informed, it is society that should bear the expense, however great, of guaranteeing that every idea, no matter how offensive, has an opportunity to present itself in the marketplace of ideas." *Invisible Empire,* 600 F.Supp. at 1434. Further, the Town gave no indication that the reimbursement condition would be waived or modified for indigents. This aspect of the condition is also an unconstitutional restraint on free speech. *See Central Florida,* 774 F.2d at 1524.

Finally, the Town cannot justify reimbursement for police or clean-up under the facts in this case. The Mayor admitted at trial that the State would provide police backup at no charge if the Mayor so requested. The Town also has a contingency fund which would cover the cost of any police overtime. Further, there is no indication that any necessary clean-up would be caused by the KKK. A representative of the KKK promised at the last Town meeting that the KKK would clean up after itself. Any litter caused by spectators unaffiliated with the KKK should be the responsibility of the Town and not the KKK.

For all of the foregoing reasons, the Town will be enjoined from imposing conditions of insurance coverage, hold harmless agreements, indemnification, and police protection and clean-up reimbursement on the KKK parade. The Court expresses no opinion on any future policies of the Town, including any charging in the future of general permit fees for parades.

### III

The most difficult issue in this case is whether the Town can constitutionally impose a nondiscrimination condition on the KKK parade. It is clear that the Town must open its sidewalks to persons of all races and religions as *spectators* at the parade. The question here, however, is whether the Town may open up the parade itself to *participants* of all races and religions, where the KKK has requested a parade for only "card-carrying members" of the KKK, which consists only of white Christians.

The parties agree that this issue involves two distinct legal theories: (1) whether granting a permit and providing police protection for a discriminatory group's parade constitutes impermissible state support of discrimination; and (2) whether the imposition of a nondiscrimination condition infringes the KKK's rights to free speech and expressive association. The first issue is relevant because the Mayor testified at trial that one of the Town's concerns about permitting the parade was that it might be violating the law by allowing a discriminatory group to parade.

■ The Court is satisfied that this case presents no impermissible state action support of discrimination. The KKK parade was to take place on the public streets of Thurmont. The streets are obviously public forums used to communicate ideas and views. *See, e.g., Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). The Fourth Circuit has squarely held that the state action doctrine does not apply to situations where a "group seeks to exercise

first amendment rights in a public forum dedicated to that purpose." *National Socialist White People's Party v. Ringers,* 473 F.2d 1010, 1017 (4th Cir.1973). That is certainly the situation here.

The granting of a parade permit and the presence of police do not amount to state espousal of discriminatory practices. If the Town's parade permission procedure were to automatically grant permission to every group which wished to parade peacefully (as it does for use of park pavilions), it would be clear to all that the Town does not support each parading group. If the Town's procedure gives the appearance of approval or disapproval of groups, it is the Town's own fault for having in place an unconstitutionally vague permission procedure whereby applicants must plead their individual cases at town meetings after which the Commissioners announce their votes and reasons therefor.

The Town and the NAACP urge that this Court's opinion in *National Association for the Advancement of Colored People, Frederick County Chapter v. Thompson,* 648 F.Supp. 195 (D.Md.1986) mandates a different result. This Court cannot agree. *Thompson* held only that the KKK could not exclude blacks from being in the audience at a public rally on private property. In the instant case, all races and religions may be in the audience watching this parade and, presumably, may even shout and jeer as they please. The Court in *Thompson* distinguished *Ringers* on those grounds as well—that *Ringers* involved a public forum where although "the party discriminated in its membership policies, the public meetings held by the Party were open to all members of the public, regardless of race." 648 F.2d at 208. The NAACP in this case is seeking more than attendance at the parade; they are seeking to take part in the KKK's speech itself by participation in the parade. *Thompson* specifically did not address the issue of whether minorities attending a KKK rally would have any right to speak. 648 F.2d at

218. *Thompson* is thus not applicable to the facts in this case.

For the foregoing reasons, the state action doctrine is not applicable here, and the Town is not required to impose a nondiscrimination condition on parades in the Town before allowing the KKK to march.

■ Even though the Town is not required to impose a nondiscrimination condition on parades, the Mayor expressed his desire to impose such a condition, regardless, because "discrimination is wrong." A nondiscrimination condition is, therefore, before the Court because in the absence of a written ordinance or regulation covering parades, it appears that the Mayor's intentions are the equivalent thereof.

The NAACP and the Town assert that the Town may regulate participation in the KKK parade in much the same manner as many civil rights laws regulate private club membership and private school admissions. The KKK responds that the proposed regulation here is not content-neutral and impermissably infringes on their right of expressive association.[1]

The KKK takes the position that marching as an all-white group in white robes is symbolic speech. The testimony at trial revealed that the KKK's group image was important to them. They wanted only KKK members in the march to show the community that they—the KKK itself—could be respectable citizens. Kelly also stated that allowing blacks to parade with the KKK would be hypocrisy because the KKK supports segregation, allegedly on religious grounds.

The landmark case setting out the standard for evaluating restrictions on symbolic speech is *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The Supreme Court held therein that "[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental inter-

1. The KKK has agreed to forego any argument they may have involving the right of intimate

association for the purposes of this case.

est is unrelated to the suppression of free expression; and if the incidental restrictions on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.* at 377, 88 S.Ct. at 1679. No one would dispute that the Town has met the first two prongs of this test. Eradicating race discrimination is within the power of government and is a compelling state interest.

Under the specific facts of this case, however, the Town cannot meet the third prong of the *O'Brien* test because it did not decide to impose a nondiscrimination condition on the KKK in a content-neutral manner. The Town's condition was related to suppression of the KKK's speech. All of the facts presented at trial lead to the conclusion that the condition was developed for the KKK and the KKK only. Never before did it occur to the Mayor to impose a nondiscrimination condition. He testified at trial that he had not thought about it prior to the KKK's application because he did not know that any prior applicants discriminated. In fact, he admitted that neither he, nor any official to his knowledge, had ever before inquired about the discrimination policies of the many groups requesting to use public property for their activities. At the first Town meeting in June, this concern was never mentioned by the Commissioners. It is clear that the Town did not even think of this condition until around the time the NAACP informed the Town that such a condition might be required. This Court does not doubt the sincerity of the Mayor in believing that discrimination is wrong. However, the Court finds that this condition was created only for the KKK with the probable knowledge that the KKK would not parade at all if forced to do so with black participants. There is no indication that the Town would in the future neutrally apply a nondiscrimination condition on every group wishing to use public property in Thurmont.

Restrictions on symbolic speech can also be analyzed in the time, place, and manner restrictions framework using the same standard enunciated in Part II above. *Clark,* 468 U.S. at 297, 104 S.Ct. at 3071. Under this standard, the nondiscrimination condition also fails because the restriction does not leave open alternative means of communication for the KKK. It has been stipulated that the KKK would not parade if the Town forced them to include black and/or nongentile persons. The KKK has also stopped its practice of holding public rallies on private property since the decision in *Thompson.* Thus, under the nondiscrimination condition, the KKK could not disseminate its views publicly on either private or public property. This is an unacceptable restriction on the communication of the KKK's message. However repugnant that message may be to the citizens of Thurmont, its public officials, and, indeed, this Court, the KKK has the right to communicate it to the public in some manner. Accordingly, this Court finds that the nondiscrimination condition is not a valid time, place, and manner restriction under these circumstances and may not be imposed on the KKK parade.

■ As an alternative ground for invalidating the proposed nondiscrimination condition, the KKK asserts that such a condition would violate their freedom of expressive association. In response, the defendants rely on a trilogy of cases recently handed down by the Supreme Court: *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984); *Board of Directors of Rotary International v. Rotary Club of Duarte,* 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987); *New York State Club Assn, Inc. v. New York City,* —— U.S. ——, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988). In those cases, nondiscrimination conditions placed on private associations were upheld.

The applicable standard by which to test governmental infringements on the right of expressive association was set out in *Roberts.* The Supreme Court therein stated that infringements on that right "may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts,* 468 U.S. at 623, 104 S.Ct. at 3252–53. Although this test is similar to the

typical time, place, and manner analysis, the Court, in the trilogy of cases, engaged in more of a balancing analysis in examining the various rights involved. The balance in this case is quite different from that in *Roberts, New York State Club Assn, Inc.,* and *Rotary Club.*

The laws at issue in the trilogy were public accommodation laws directed at associations where commercial activity occurred. The underlying purposes of these laws were to provide equal opportunity to minorities and women to participate in the business life of the community and to expose them to the business contacts and activity which often occur at discriminatory clubs. The state has a compelling interest in ensuring equal access to such advantages as business and professional opportunities and skills. *See Roberts,* 468 U.S. at 626, 104 S.Ct. at 3254.

Those cases, however, do not stand for the proposition that the state may require noncommercial expressive associations to allow minorities to participate in expressive group activities. In those cases, the regulation only minimally affected the groups' various messages and the groups were not formed solely for the purpose of communicating ideas.

The Supreme Court has implied that if an association is organized for "specific expressive purposes and ... it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion," then a nondiscrimination condition may be an unconstitutional infringement on expressive association. *New York State Club Assn, Inc.,* 108 S.Ct. at 2234. The Court, thus, looks at the connection between membership and the message. *See, e.g., Roberts,* 468 U.S. at 631, 104 S.Ct. at 3256–57 (O'Connor, J., concurring).

If ever there was a case where the membership and the message were coextensive, it is here. The KKK is certainly organized for specific expressive purposes. The KKK desires to convince others of the need for segregation of the races and to send the message of white supremacy.[2] They want to march as a distinct unit to show Thurmont that they are respectable, peaceful, and support good causes, in addition to recruiting new members to the cause. Further, the KKK's message of white separatism would be destroyed if blacks were to march with them. As Kelly testified, they would be hypocrites. The KKK has nothing to do with the distribution of goods and services, nor with business contacts or advantages. The group's primary purpose is to advocate one main concept—that blacks and whites should not mix. Allowing blacks to march with the KKK would change the primary message which the KKK advocates. It is disingenuous to say, as the NAACP does, that the KKK can still speak directly or by holding up placards with separatist messages. The KKK's message would be lost. In fact, the KKK would not march at all.

The Town's interest here, although compelling, is somewhat less compelling than the states' interests in the club cases. Black and nongentile persons here are not being denied the opportunity to gain business contacts and skills. They are merely being denied the right to march in a private group's parade. This is entirely proper; a group may limit a parade to its own members. *See, e.g., Sanders v. United States,* 518 F.Supp. 728, 730 (D.D.C.1981), *aff'd* 679 F.2d 262 (D.C.Cir.1982) (discussing the fundamental interest in "guaranteeing citizens the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens."); the facts in *Gay Veteran Association, Inc. v. American Legion,* 621 F.Supp. 1510 (S.D.N.Y.1985) (aff'd by the Second Circuit orally from the bench Nov. 8, 1985, without written decision). Clearly, the Town would not allow the KKK to march in the homecoming parade; nor would the firefighters allow the KKK to march in their annual parade. If one accepts the proposition that a group can parade with only its own members, it is clear

---

**2.** Although Kelly testified that he personally does not believe in white supremacy, it is clear that his group as a whole does believe in white supremacy as reflected in their brochures.

that the real question in this case is whether a segregated group that believes in segregation could ever parade in Thurmont.

The answer must be yes, if we as a nation are to keep alive the free and robust debate guaranteed by the First Amendment. To hold otherwise would in effect suppress a voice in the Town of Thurmont. Fortunately, integration has carried the day in the marketplace of ideas in this country; however, the situation might be different if the First Amendment had not strongly protected the voices of the supporters of integration who sought to change the system. Our society must allow every person to speak, no matter how offensive the message, unafraid of who might prevail in the marketplace of ideas.

The Court has already noted that this nondiscrimination condition was related to the suppression of speech. Furthermore, the Town has not considered alternatives which are less restrictive of associational freedoms. For example, it could allow the NAACP to march at the same time at a different location. It could also allow the NAACP to march prior to or subsequent to the KKK. In fact, in oral argument, counsel for the NAACP stated that the NAACP would be satisfied if they could march as a separate unit in the same parade—semantics aside, this is really the equivalent of conducting its own parade several minutes later. The NAACP is certainly permitted to shout on the adjoining sidewalks. The NAACP and all citizens also have the most effective option of all available—to ignore the KKK parade and its message entirely. "Recognition of the full scope of freedom of speech does not compel anyone to listen, or if listening to believe." *Collin*, 578 F.2d at 1210 (Wood, J., concurring). Black and nongentile persons are allowed to parade in Thurmont—they just may not do so shoulder-to-shoulder with the KKK. This Court naturally suspects that the NAACP does not really want to march side by side with the KKK. The Court does not go so far as to find that the NAACP's position here is a pretext to prevent the KKK from marching at all, but the question is there.

For all of the foregoing reasons, the Court finds that the nondiscrimination condition is an unconstitutional infringement on the KKK's rights of expressive association.

Although the Court has found against the Town on all of the issues before it, this opinion should not be taken as an indictment of the judgment of Town officials. The Court sympathizes with the Town's dilemma. Unfortunately, the Town was caught between two powerful interest groups—the ACLU and the NAACP—both threatening the Town with lawsuits. Given the nature of the Town's governance system and town meeting format, the Town understandably acceded to the perceived desires of its citizens to maintain the Town's peaceful, uncontroversial atmosphere and to dissociate itself from the KKK.

In light of the circumstances surrounding this case, the comments of the Seventh Circuit are appropriate here as well:

The preparation and issuance of this opinion has not been an easy task, or one which [the Court has] relished. Recognizing the implication that often seems to follow over-protestation, [the Court] nevertheless feel[s] compelled once again to express [its] repugnance at the doctrines which the [plaintiffs] desire to profess publicly. Indeed, it is a source of extreme regret that after several thousand years of attempting to strengthen the often thin coating of civilization with which humankind has attempted to hide brutal animal-like instincts, there would still be those who would resort to hatred and vilification of fellow human beings because of their racial background or their religious beliefs, or for that matter, because of any reason at all.

Retaining meaning in civil rights, particularly those many of the founding fathers believed sufficiently important as to delay the approval of the Constitution until they could be included in the Bill of Rights, seldom seems to be accomplished by the easy cases, however, and it was not so here.

The result [the Court has] reached is dictated by the fundamental proposition that if these civil rights are to remain vital for all, they must protect not only those society deems acceptable, but also those whose ideas it quite justifiably rejects and despises.

*Collin*, 578 F.2d at 1210. The task of this Court was made even more difficult by the appealing and laudable nature of the concept of a nondiscrimination condition. If, however, the Court were to allow such facially appealing concepts to be used as tools to suppress unpopular speech, the First Amendment would soon lose its meaning. Needless to say, the holdings in this opinion are fact-specific and would not apply to typical nondiscrimination conditions; this case has combined a highly unusual set of circumstances.

For all of the foregoing reasons, the Court finds in favor of the plaintiff. The Court will enter a separate order granting declaratory and injunctive relief to effectuate the provisions of this opinion. The Court will reserve its decision as to attorneys' fees until they are properly before the Court upon the filing of a motion by the plaintiff. Nominal damages of $1 and costs will be assessed against the Mayor, Board of Commissioners, and Chief of Police of the Town of Thurmont, in their official capacities.

### ORDER, FINAL JUDGMENT, AND DECLARATORY RELIEF

This action came on for a nonjury trial before this Court, the Honorable Walter E. Black, Jr., United States District Judge, presiding. The issues were tried, and the Court rendered its written opinion today.

In accordance with the Court's opinion, IT IS, this *1st* day of December, 1988, by the United States District Court for the District of Maryland:

ORDERED AND ADJUDGED:

(1) That judgment BE, and the same hereby IS, ENTERED in favor of the plaintiff, Invisible Empire of the Knights of the Ku Klux Klan, Maryland Chapter, against defendants, Mayor, Board of Commissioners, and Chief of Police of the Town of Thurmont, MD, in their official capacities, in the sum of One Dollar, with costs;

(2) That the denials by the Town of Thurmont of the Maryland State Highway Administration permit application and of the Town of Thurmont's permission and consent for the plaintiff to parade in the Town of Thurmont violated the plaintiff's First and Fourteenth Amendment rights under the Constitution of the United States;

(3) That the Town of Thurmont's procedure for processing parade requests is unconstitutional and violated and continues to violate plaintiff's First and Fourteenth Amendment rights under the Constitution of the United States;

(4) That defendants, Mayor, Board of Commissioners, and Chief of Police of the Town of Thurmont, their agents, servants, employees, and all others controlled by them, are hereby PERMANENTLY ENJOINED and RESTRAINED from:

(a) Unreasonably and unconstitutionally withholding their permission and consent from a request by the plaintiff for a parade in the Town of Thurmont and from unreasonably and unconstitutionally refusing to approve a State Highway Administration Special Event Permit application by plaintiff for a parade in the Town of Thurmont;

(b) Requiring that the plaintiff enter into a hold harmless or indemnification agreement, post insurance coverage, and/or pay for the costs, if any, of police and/or sanitation services incident to a parade in the Town of Thurmont;

(c) Requiring that the plaintiff allow nonmembers of the plaintiff to march in their parade; and

(d) Imposing any other unconstitutional condition on the plaintiff's parade.