# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 99-2334
No. 99-2501

_____

Michael Cuffley; Knights of the      *
Ku Klux Klan, Realm of Missouri,      *
     *
        Appellees/Cross-Appellants,      *
     *
        v.      *
     *
Joe Mickes, in his official capacity as      *
Chief Engineer of the Missouri      *
Department of Transportation;      *
Stephen Knobbe, in his official      *
capacity as District Engineer of      *
Missouri Department of      *    Appeal from the United States
Transportation, St. Louis Metro      *    District Court for the
District; Stacey Ann Armstrong, in      *    Eastern District of Missouri.
her official capacity as Roadside      *
Management Supervisor of the      *
Missouri  Highway and Transportation      *
Department; Thomas M. Boland;      *
Robert E. Jones; Edward Douglas;      *
S. Lee Kling; James W. Gamble;      *
William E. Gladden, in their official      *
capacities as commissioners of the      *
MO Highway and Transportation      *
Commission,      *
     *
        Appellants/Cross-Appellees.      *
     *
---------------------------      *

Arkansas State Highway Commission;   *
United States of America.            *
                                     *
   Amici on Behalf of Appellant.     *
                  _____

            Submitted: January 11, 2000
              Filed:   March 31, 2000
                  _____

Before WOLLMAN, Chief Judge, BOWMAN, and HANSEN, Circuit Judges.
                  _____

BOWMAN, Circuit Judge.

The Knights of the Ku Klux Klan, Realm of Missouri, and Michael Cuffley in his capacity as its Unit Recruiter (collectively, the Klan) brought this action for injunctive and declaratory relief from the decision of the Missouri Highway and Transportation Commission (the State) to deny its application to participate in the State's Adopt-A-Highway program. On cross motions for summary judgment, the District Court[1] granted judgment for the Klan. We affirm.

I.

This is the second appeal in the Klan's effort to participate in the Adopt-A-Highway program. In the first case, the State, without taking official action on the Klan's application, sought a declaratory judgment that it lawfully could prevent the Klan from adopting a highway. See Missouri ex rel. Missouri Highway & Transp. Comm'n v. Cuffley, 927 F. Supp. 1248 (E.D. Mo. 1996) (Cuffley I). We dismissed that action

_____

[1] The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

because we lacked jurisdiction over the State's request for essentially an advisory opinion on its plan to deny the application. See Cuffley I, 112 F.3d 1332 (8th Cir. 1997) (finding no federal question jurisdiction and no Article III case or controversy). At the time, we emphasized that "we cannot determine what reasons the State actually will choose to support its denial." Id. at 1338.

The State now has acted on the Klan's application. In an August 14, 1997, letter to the Klan, the State gave five reasons for denying its application:

> [1] The Knights of the Ku Klux Klan does not adhere to all state and federal nondiscrimination laws in that it discriminates on the basis of race, religion, color and national origin. [2] The Knights of the Ku Klux Klan has a history of unlawfully violent and criminal behavior. [3] 42 USC2000(d)4a(I)(A) [Title VI of the Civil Rights Act of 1964] prohibits Missouri Department of Transportation from conferring a benefit to the Knights of the Ku Klux Klan because of the Knights' discriminatory practices, and granting the application would confer such a benefit in contravention of federal law. [4] Executive Order 94-03 prohibits state agencies from allowing discriminatory practices on state facilities and prohibits contracting with an organization that discriminates, and, therefore, prohibits the Knights of the Ku Klux Klan from participating in this program. [5] The district has placed a moratorium on adoptions on interstate highways within the City of St. Louis.

Letter from Stephen Knobbe to Michael Cuffley (Aug. 14, 1997). This time the Klan filed suit. On cross motions for summary judgment, the District Court granted summary judgment for the Klan. See Cuffley v. Mickes, 44 F. Supp. 2d 1023 (E.D. Mo. 1999) (Cuffley II). We now have a "concrete record for judicial consideration" and can decide the issues pressed before us. Cuffley I, 112 F.3d at 1338.

II.

We review a summary judgment decision de novo.[2] "The party seeking summary judgment must establish the absence of a genuine issue of material fact and his entitlement to judgment as a matter of law." Artis v. Francis Howell N. Band Booster Ass'n, 161 F.3d 1178, 1180 (8th Cir. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). We may affirm the decision of the District Court on any basis supported by the record. See id.

We believe the undisputed facts conclusively demonstrate that the State unconstitutionally denied the Klan's application based on the Klan's views.[3]

---

[2] After de novo review of the State's argument that, based on a case from the Fifth Circuit, the Klan is collaterally estopped from arguing that its constitutional rights are violated by a state's refusal to allow them to adopt a highway, we entirely agree with the analysis of the District Court on this issue. See Cuffley II, 44 F. Supp. 2d at 1026 n.2. In Texas v. Knights of the Ku Klux Klan, 58 F.3d 1075 (5th Cir. 1995), the Fifth Circuit did not decide that the Klan had no right to adopt a highway. Instead, that court concluded that the state's reason for denying the Klan's application to adopt a portion of highway outside a public housing project—to prevent the Klan from intimidating residents and frustrating a federal desegregation order—were reasonable and viewpoint neutral. Here, the State does not argue that the Klan's adoption of the highway will have such an effect. And like the Fifth Circuit, we do not decide whether the Klan has the right to adopt a highway. We only decide that the State may not deny the Klan's application to adopt a highway based on the Klan's views.

[3] The District Court summarily disposed of the Klan's claim that the State violated the Equal Protection Clause by "conditioning" access to the Adopt-A-Highway program based on the applicant's views. The Klan filed a cross appeal to preserve this issue. Whether this claim arises under the Equal Protection Clause or the First Amendment, it is clear that the State may not deny access to the Adopt-A-Highway program based on the applicant's views. Thus, unlike the District Court's decision in this case and this Court's decision in Knights of Ku Klux Klan, Realm of Missouri v. Curators of the University of Missouri, __ F.3d __, 2000 WL 189834 (8th

-4-

From the very beginning of this controversy when the Klan first applied to adopt a highway in May 1994, the State treated the Klan differently from the vast majority of applicants. The deposition of Stacy Armstrong, the statewide coordinator for the Adopt-A-Highway program and designated to speak on behalf of the State in the initial litigation, is remarkable for its candor in this regard.

> Q.    . . . Now, somebody at some point must have made a decision that this was the kind of case, this Klan application was the kind of case, that must be referred for special treatment, whether it be by higher-ups or it be by the court to make a decision; right?
> A.    Right.
> . . .
> A.    The Adopt-A-Highway coordinator for the district called me. . . .
> Q.    Now, is it fair to say that his calling you about an individual application to ask your guidance as to what to do is something that's out of the ordinary?
> . . .
> A.    I'd say yes.
> Q.    It connotes a special situation?
> A.    Right.

Deposition of Stacy Armstrong at 57-59 (Apr. 12, 1995). And it is undisputed that this disparate treatment was based on the State's perception of the Klan's beliefs.

---

Cir. Feb. 17, 2000), we need not discuss whether the Klan is "speaking" for the purposes of the First Amendment or whether the Adopt-A-Highway program is a public forum. Moreover, the issues we face here are fundamentally different than those discussed in this Court's recent decision that a publicly-owned radio station is not obligated to accepted the Klan's sponsorship of a National Public Radio program. That case rested largely on the unique context of public broadcasting, in which editorial discretion to select programming and sponsors looms large. And unlike this case, the radio station had legitimate reasons for its refusal to accept the Klan's sponsorship, and there was absolutely no showing of viewpoint discrimination.

Q. And what is it about the Klan application that he considered to be a special situation?
A. It was just who it was from and what they wanted on the sign.
Q. It had to do with what he perceived to be their beliefs?
A. As a group, yes.
Q. And what they were advocating?
A. Right.
. . .
Q. And that the basis for your decision to treat this organization's application for further review was based on your perception of what the group believed and what they advocated?
A. Right.

Id. at 59-61. There are repeated admissions from the State's designee on these points, including the surprising admission that the State thinks it has the right to deny an application on the basis of the applicant's beliefs.

Q. So you believe as part of your job that you should examine a group's beliefs to see if there's something about what they believe in and what they advocate to see if they may be qualified or disqualified from the program?
A. I think that we have a right to look at what they stand for and what they believe.
Q. And if they don't stand for something that is acceptable to the department, you believe that you can disqualify them from the program; is that correct?
. . .
A. . . . I think the department has the right to deny somebody.
Q. On the basis of their beliefs?
A. On the basis of their beliefs, yes.

Id. at 19-20.

The State since has filed a "curative" affidavit from Armstrong. Armstrong now maintains that the State does not consider the beliefs of the applicant, but simply

applies Adopt-A-Highway program regulations to determine whether an applicant is eligible to adopt.[4] We do not believe, however, that Armstrong's deposition evinces the kind of mistake and confusion necessary to allow her contradictory affidavit to create an issue of fact on these points. See Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983). Accordingly, we reject her affidavit and conclude that there is no question that the State treated the Klan differently from the

---

[4] These regulations were filed and became effective in 1995 while the first action was pending and after Armstrong's original deposition. The regulations provide in relevant part:

(1) Eligible Adopters. Eligible adopters include civic and nonprofit organizations, commercial and private enterprises and individuals. The program is not intended as a means of providing a public forum for the participants to use in promoting name recognition or political causes. The commission reserves the right to limit the number of adoptions for a single group.

(2) Acceptance of Application. The commission will have sole responsibility in determining whether an application is rejected or accepted and determining what highways will or will not be eligible for adoption.
   (A) The commission may refuse to grant a request to participant if, in its opinion, granting the request would jeopardize the program, be counterproductive to its purpose or have undesirable results such as increased litter, vandalism or sign theft.
   (B) Applicants must adhere to the restrictions of all state and federal nondiscrimination laws. Specifically, the applicant must not discriminate on the basis of race, religion, color, national origin or disability. Such discrimination disqualifies the applicant from participation in the program.
   (C) Applicants with a history of unlawfully violent or criminal behavior will be prohibited from participation in the program.

Mo. Code Regs. Ann. tit. 7, § 10-14.030 (1995)

vast majority of applicants based on the State's perception of the Klan's beliefs and advocacy.

To be sure, a justification for further review of an application does not necessarily equate with the justification for denial of an application. Nevertheless, absent a convincing and constitutional reason for the denial, the evidence leaves us with but one conclusion: that the State denied the Klan's application based on the Klan's beliefs and advocacy. For the last fifty years, the Supreme Court has made it clear that such a denial is unconstitutional:

> [E]ven though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

Perry v. Sindermann, 408 U.S. 593, 597 (1972) (quoting Speiser v. Randall, 357 U.S. 513, 526 (1958) (alteration in Perry)).[5]

---

[5] This "unconstitutional conditions" doctrine is not limited to valuable government benefits or even benefits at all. The Supreme Court has held that a legal entitlement to a position or program is not necessary in order to assert an unconstitutional conditions claim. See Rutan v. Republican Party, 497 U.S. 62, 72 (1990) (citing Perry, 408 U.S. at 596-98). At least two circuits have applied this analysis to volunteer governmental positions. See Andersen v. McCotter, 100 F.3d 723, 727 (10th Cir. 1996); Hyland v. Wonder, 972 F.2d 1129, 1135 (9th Cir. 1992), cert. denied, 508 U.S. 908 (1993).

As we have noted, in its letter to the Klan, the State offered five reasons to support its denial of the application. We need not address the State's fifth purported reason, the moratorium within the City of St. Louis, because the Klan amended its application to adopt a stretch of Interstate 55 south of the City of St. Louis. Accordingly, this aspect of the controversy is now moot. We discuss the State's first four reasons below.

The State's first purported reason for denying the Klan's application essentially amounts to the State's contention that the Klan does not satisfy one of the regulations issued by the State shortly after the Klan first submitted its application: "Applicants must adhere to the restrictions of all state and federal nondiscrimination laws. Specifically, the applicant must not discriminate on the basis of race, religion, color, national origin or disability. Such discrimination disqualifies the applicant from participation in the program." Mo. Code Regs. Ann. tit. 7, § 10-14.030(2)(B). There is no question that the Klan discriminates in membership on the basis of race, religion, color, and national origin. The question is whether any state or federal nondiscrimination law applies to the Klan. The State does not point to any specific nondiscrimination law that the Klan is violating.[6] Even assuming the existence of such a law, we think its direct application to the Klan in this case would violate the Klan's freedom of political association. There seems little question that requiring the Klan to accept non-"Aryans" would significantly interfere with the Klan's message of racial superiority and segregation. Cf. New York State Club Ass'n v. City of New York, 487 U.S. 1, 13 (1988) ("It is conceivable, of course, that an association might be able to show that it is organized for specific expressive purposes and that it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion."); Board of Dirs.

---

[6] In its letter to the Klan, the State cited Title VI of the Civil Rights Act of 1964 and Missouri Executive Order 94-03 as separate reasons for denying the Klan's application. We discuss those reasons below.

of Rotary Int'l v. Rotary Club, 481 U.S. 537, 548 (1987) (considering whether "admitting women to Rotary Clubs will affect in any significant way the existing members' ability to carry out their various purposes"); Roberts v. United States Jaycees, 468 U.S. 609, 627 (1984) (considering whether "admission of women as full voting members will impair a symbolic message conveyed by the very fact that women are not permitted to vote"); but cf. Runyon v. McCrary, 427 U.S. 160, 176 (1976) ("[I]t may be assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable . . . . But it does not follow that the practice of excluding racial minorities from such institutions is also protected by the same principle.").

Requiring the Klan essentially to alter its message of racial superiority and segregation by accepting individuals of other races, religions, colors, and national origins in order to adopt a highway would censor its message and inhibit its constitutionally protected conduct. We find Invisible Empire of the Knights of Ku Klux Klan v. Mayor of Thurmont, Md., 700 F. Supp. 281 (D. Md. 1988), persuasive in this regard. In Thurmont, the court held that a town's nondiscrimination condition on public parades violated the Klan's freedom of expressive association. The court surveyed the trilogy of Supreme Court private association cases cited above and concluded:

> If ever there was a case where the membership and the message were coextensive, it is here. . . . The KKK has nothing to do with the distribution of goods and services, nor with business contacts or advantages. The group's primary purpose is to advocate one main concept—that blacks and whites should not mix. Allowing blacks to march with the KKK would change the primary message which the KKK advocates.

Id. at 289.

-10-

The State's response to <u>Thurmont</u>, and indeed, one of its broader arguments, is that, unlike in <u>Thurmont</u> where the Klan would simply march along a public street, here the State would enter into some kind of "prohibited" relationship with the Klan. As we understand its argument, the State fears that it would violate the Fourteenth Amendment by allowing the Klan to adopt a highway. The State cites <u>Burton v. Wilmington Parking Authority</u>, 365 U.S. 715 (1961), for the proposition that discrimination by a group associated with the State is, in effect, discrimination by the State and thus meets the state action requirement of the Fourteenth Amendment. But even <u>Burton</u> does not extend so far as to reach the relationship at issue here. In <u>Burton</u>, the Supreme Court found state action when a private coffee shop, operating within a publicly owned building, refused service to a black customer. What we have here, however, is more like a State owned coffee shop offering service to a group of customers who want a table for only their white friends.[7] The state action doctrine does not extend so far. The State simply cannot condition participation in its highway adoption program on the manner in which a group exercises its constitutionally protected freedom of association. Accordingly, we conclude that this reason for refusing participation, like the viewpoint reason admitted in deposition, constitutes an unconstitutional condition on the Klan's participation in the Adopt-A-Highway program.

The State's second purported reason, that the Klan has a history of unlawfully violent and criminal behavior, is based on another of the State's new regulations: "Applicants with a history of unlawfully violent or criminal behavior will be prohibited from participation in the program." Mo. Code Regs. Ann. tit. 7, § 10-14.030(2)(C). All of the evidence, however, supports the Klan's contention that this reason is pretextual.

---

[7] Even this analogy is too favorable to the State's position. At oral argument, the State admitted that, subject to safety restrictions, anyone can pick up trash along Missouri highways, including highways adopted by others. That is, the Klan's adoption of a highway does not in any way prohibit others from cleaning along that portion of the highway.

As we read the regulation, anyone who has ever committed any criminal act, from murder and mayhem to joyriding and jaywalking, is ineligible to participate in the program. Were the State actually to enforce this regulation with any regularity, we have little doubt the Adopt-A-Highway program would soon have few adopters. Recognizing this problem, the State is not really sure how the regulation should be applied:

> Q. All right. Well, tell me what criminal behavior is?
> A. Criminal behavior is behavior that violates the law.
> Q. Any law?
> A. I would say that is what it would intend.
> Q. Have you ever gotten a ticket for speeding?
> A. No, I haven't, but I wouldn't call that a history.
> Q. Well, it says—all right. If you've got 10 tickets for speeding, would that be a history?
> A. It would depend on the time frame.
> Q. Okay. Drunk driving? DWI? BAC?
> A. I'm not sure that would. It could.
> Q. It could. Depending on?
> A. <u>I can't give you a criteria.</u>
> Q. How about antitrust? Archer Daniels Midland pleaded guilty to criminal antitrust violations, federal criminal antitrust violations. Are they excluded from adopting a highway?
> A. I would say if there was any question, I would seek legal counsel on it.

Deposition of Joseph A. Mickes at 52 (Mar. 20, 1998) (emphasis added). That the State does not know how the regulation applies in practice to the Adopt-A-Highway program is not surprising because the State has never applied the regulation to anyone other than the Klan. Even though the regulation became effective in July 1995, barely a year after the Klan filed its application, the State has never asked an applicant a single question about criminal history, has never done a single investigation of criminal

history, and has no idea whether any of the participants in the program have such a history. At oral argument, the State backed further away from the incredible breadth of the regulation, arguing that it was intended to address violent criminal behavior such as that committed by the Klan in the past. The State's argument makes even clearer what was already obvious: that this regulation was intended to target only the Klan and its views.

The State's third purported reason for denying the Klan's application is that allowing the Klan to participate in the Adopt-A-Highway program would violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1994), and could cause the State to lose federal highway funding. Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Id.; see also id. § 2000d-4a (defining "program or activity" to include all operations of State government departments); id. § 2000d-1 (authorizing termination of federal funding for programs that violate Title VI).

Title VI clearly does not apply directly to prohibit the Klan's discriminatory membership criteria. The Klan is not a direct recipient of federal funds nor are federal funds earmarked for the Klan. See National Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 468 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only benefit economically from federal assistance are not."). There is not even an allegation here that the State pays for the Adopt-A-Highway program with earmarked federal funds. The Klan thus is not subject to Title VI.

The question remains, however, whether Title VI prohibits the State from allowing the Klan to participate in the Adopt-A-Highway program. Under U.S. Department of Transportation regulations, the State, as a recipient of federal funds,

"may not, directly or through contractual or other arrangements, on the grounds of race, color, or national origin . . . [d]eny a person an opportunity to participate in the program through the provision of services or otherwise or afford him an opportunity to do so which is different from that afforded others under the program." 49 C.F.R. § 21.5(b)(1)(vi) (1999). The United States, as amicus curiae, argues that, in allowing the Klan to adopt a highway, the State would violate the regulatory prohibition on any arrangement that bars individuals from participating in a program on the basis of race. In essence, the United States argues that allowing the Klan to adopt a portion of highway would deny other people an opportunity to pick up litter on that portion of the highway on the same terms as the Klan. Once again, we note that the Klan's adoption of a highway does not in any way prohibit others from cleaning along that portion of the highway. But more to the point, we believe the United States interprets the "program" at issue too narrowly. Neither the Klan nor the State would operate a subprogram on the Klan's adopted stretch of highway; instead, the Klan simply would be one of many participants in the overall Adopt-A-Highway program. So long as the State does not deny anyone an opportunity to adopt a highway on an improper basis, the State does not violate Title VI. The Klan, as one of many voluntary participants in the program, is free to determine its own membership.

The State's fourth purported reason for denying the Klan's application is that the State would violate Article VII of the State's Executive Order 94-03 (Jan. 14, 1994) by allowing the Klan to adopt a highway. That Order provides:

> Every department shall offer its services to the public without discrimination. No State facility shall be used to promote any discriminatory practice, nor shall any department become a party to any agreement which permits any discriminatory practice prohibited by this order, state or federal law.

First, as we described above in the Title VI context, offering a service to a group that discriminates is not equivalent to discrimination in the offering of that service. Second,

-14-

the State admitted repeatedly in depositions that it does not view the erection of an Adopt-A-Highway sign as an endorsement or promotion of the adopter. In fact, the State's own regulations, conveniently drafted after the Klan applied, provide that "[t]he program is not intended as a means of providing a public forum for the participants to use in promoting name recognition or political causes." Mo. Code Regs. Ann. tit. 7, § 10-14.030(1) (emphasis added). Third, the State does not point to any part of the Order or any state or federal law that prohibits the Klan from discriminating in its membership criteria. Accordingly, Executive Order 94-03 does not prohibit the State from allowing the Klan to adopt a highway, and the State's fourth and last reason fails.

Not only do the State's discrimination-related reasons not make sense, but there is also evidence that, like the criminal-history reason, these three reasons are entirely pretextual. The State admitted repeatedly in deposition testimony that it does not ask organizations that apply to the program about their membership criteria nor does it investigate the applicants' membership criteria. Instead, the State claims to rely solely on common knowledge. But the State has never denied the application of any other group on the grounds of discriminatory membership. A quick glance down the list of participants in the Adopt-A-Highway program, however, reveals many adopters that have discriminatory membership criteria. For example, it is commonly known that the Knights of Columbus, a venerated service organization that has chapters adopting many stretches of highway across the State, limits its membership to Catholic men.[8] Once again, the State's actions speak louder than its words.

The State's purported reasons for denying the Klan's application are so obviously unreasonable and pretextual that, in the end, we are left only with the admitted reason the State was motivated to so carefully scrutinize the Klan's application as an

---

[8] During deposition testimony and at oral argument, the State maintained that the membership criteria of the Knights of Columbus did not violate its regulations because "anyone could become Catholic." We think this argument requires no response.

explanation for the denial: that the State disagrees with the Klan's beliefs and advocacy. Nevertheless, the First Amendment protects everyone, even those with viewpoints as thoroughly obnoxious as those of the Klan, from viewpoint-based discrimination by the State. "Such interference with constitutional rights is impermissible." Perry, 408 U.S. at 597.

There are better ways of countering the Klan's repellent philosophy than by the State's engaging in viewpoint-based discrimination. In a myriad of constitutionally sound ways, state officials and private citizens alike may oppose the Klan's racially divisive views and express disapproval of those views in the strongest terms. But viewpoint-based exclusion of any individual or organization from a government program is not a constitutionally permitted means of expressing disapproval of ideas—even very poor ideas—that the government disfavors. We affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.