Flannery, J.
This case involves the claimed right of the plaintiff, Irish-American Gay, Lesbian and Bisexual Group of Boston (GLIB), to march in Boston’s annual St. Patrick’s/Evacuation Day Parade (Parade) over the opposition of the defendants, South Boston Allied War Veterans Council (Veterans or Veterans Council), who organize and run the Parade. GLIB contends that its exclusion from the Parade violates M.G.L.c. 272, §§92A and 98, which prohibit sexual orientation discrimination in places of public accommodation. GLIB also alleges that the Veterans’ exclusion of GLIB from the Parade abridges GLIB members’ constitutional rights to freedom of expression and association and denies them equal protection of the laws as guaranteed by the First and Fourteenth Amendment to the United States Constitution and Articles 1 and 16 of the Massachusetts Declaration of Rights. GLIB seeks declaratory and permanent injunc-tive relief. The Veterans Council contends that it may lawfully exclude GLIB because neither the public accommodations statute nor the 14th Amendment applies to its Parade. The Veterans argue that the Fourteenth Amendment is irrelevant because there is no state action; and the statute is inapplicable because the Parade is not a place of public accommodation, and because application of it would be an impermissible infringement of the Veterans’ constitutional right of expressive association.
The City of Boston (City) is also a defendant. GLIB alleges that the Parade is subject to the 14th Amendment, and therefore exclusion of it on account of its sexual orientation offends the equal protection clause and interferes unlawfully with its freedoms of association and expression. The Veterans’ cross-claim against the City for its unlawful interference with their Parade. The City denies that the Parade is a state action event and denies the Veterans cross-claim allegations.
On the basis of a four-day bench trial, which heard 12 witnesses and received 113 exhibits, I make the following findings of fact and conclusions of law as required by Mass.R.Civ.P. 52(a).
DISCUSSION
GLIB alleges that by denying its members the right to register for and march in the 1993 Parade because of their sexual orientation, both the City and the Veterans violated M.G.L.c. 272, §§92A and 98 (the public accommodations law). Section 98 prohibits “any distinction, discrimination or restriction on account of . . . sexual orientation ... in any place of public accommodation, resort or amusement” and the aid or incitement thereof. M.G.L.c. 272, §98.
In January of 1992, Barbra Kay and others[3] founded the Irish-American Gay, Lesbian and Bisexual Group of Boston (“GLIB”). As the name tells, GLIB is an organization of Irish-Americans who are gay, lesbian, or bisexual, and their supporters. A social organization, GLIB was formed to march in the St. Patrick’s/Evacuation Day Parade. GLIB’s purposes were threefold: to express its members’ pride in their dual identities; to demonstrate to the Irish-American and to the gay, lesbian, and bisexual communities the diversity within those respective communities; and to show support for the Irish-American gay, lesbian, and bisexual men and women in New York City (“ILGO” members) who were seeking to participate in the New York St. Patrick’s Day Parade. GLIB has regular meetings about once a month, produces a newsletter for members, maintains a voicemail box, and has published an informational brochure. GLIB members also participate in various cultural and social activities, including the 1993 Dorchester Day Parade and a fundraising walkathon for the AIDS Action Committee.
When the Veterans initially denied GLIB’s application to participate in the 1992 Parade, they cited “safety reasons and insufficient information regarding [the] social club.” Exh. 72. GLIB marched uneventfully in the 1992 Parade under court order.[4] In 1993, the Veterans again denied GLIB permission to participate in the Parade, asserting the decision to exclude groups with sexual themes merely formalized that the Parade expresses traditional religious and social values. Exh. 43. At the recent trial, John J. Hurley equivocated about his reasons for excluding GLIB but ultimately *372 testified that he would never allow GLIB to march.[5] These shifting explanations for excluding GLIB demonstrate the pretextual nature of these excuses. Invisible Empire of the Knights of the Ku Klux Klan v. Thurmont, 700 F.Supp. 281, 287 (D.Md. 1988) The evidence establishes that GLIB was excluded from the Parade on account of its members’ sexual orientation, and I so find. See also Meredith v. Fair, 305 F.2d 343, 361 (5th Cir. 1962) (finding no valid, non-discriminatory reason for University to reject Meredith).[6]
In order for the public accommodations law to apply, however, the Parade must be “a place of public accommodation, resort or amusement” as defined by Section 92A. The plaintiff urges that the statute should be construed broadly in order to effectuate its remedial purpose. The Veterans argue that a parade, unlike a tavern or a barbershop, can not be a “place of public accommodation, resort or amusement.” Although our courts have held preliminarily that the Parade is subject to the statute, Irish American Gay, Lesbian & Bisexual Group of Boston v. City of Boston, No. 93-J-138 (Mass.App.Ct. March 1, 1993, Brown, J., single justice) (affirming preliminary injunction requiring GLIB’s inclusion in 1993 Parade); Irish American Gay, Lesbian & Bisexual Group of Boston v. City of Boston, C.A., No. 92-1518 (Suffolk Super. Ct. Feb. 19, 1993, Zobel, J.); Irish American Gay, Lesbian & Bisexual Group of Boston v. City of Boston, C.A. No. 92-1518 (Suffolk Super. Ct. March 11, 1992, Zobel, J.), the Veterans point to an expression of judicial doubt on the subject, South Boston Allied War Veterans Council v. The Honorable Hiller B. Zobel C.A. No. 93-10509-WF (D.Mass. March 11, 1993, Wolf, J.) (noting public accommodations statute does not expressly include parades).
The statute defines a place of public accommodation, resort or amusement as: “any place . . . which is open to and accepts or solicits the patronage of the general public and, without limiting the generality of this definition, whether or not it be ... (6) a boardwalk or other public highway; . . . [or] (8) a place of public amusement, recreation, sport, exercise or entertainment.” M.G.L.c. 272, §92A. As an initial matter, the Parade must be found to be “a place.” United States Jaycees v. Massachusetts Commission Against Discrimination, 391 Mass. 594, 603 (1984). The statute specifically identifies “a boardwalk or other public highway” or “a place of public amusement, recreation, sport, exercise or entertainment” as places within the purview of the statute.
For at least the past 47 years, the Parade has traveled the same basic route along the public streets of South Boston, providing entertainment, amusement, and recreation to participants and spectators alike. Even if the examples enumerated in the statute (inn, theater, etc.) restricted the general statutory language, which they do not, Local Finance Co. v. Massachusetts Commission Against Discrimination, 355 Mass. 10, 13 (1968), the public streets of South Boston can be fairly characterized as a boardwalk or a place of amusement, recreation, or entertainment during the hours of the Parade. Given the Supreme Judicial Court’s directive that the statute be given a broad inclusive interpretation so that it may achieve its goal of eliminating and preventing discrimination, Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination, 402 Mass. 716, 720 (1988); Local Finance Co. v. Massachusetts Commission Against Discrimination, 355 Mass. 10, 14 (1968), I find that the Parade through the streets of South Boston constitutes “a place” within the meaning of M.G.L.c. 272, §92A. Compare United States Jaycees v. Massachusetts Commission Against Discrimination, 391 Mass. 594 (1984) (finding discriminatory membership policy not subject to M.G.L.c. 272, §92A because criterion of “place” not established); see also New York Roadrunners Club v. State Division of Human Rights, 81 A.D.2d 519, 437 N.Y.S.2d 681, 682 (1981) (route of New York Marathon found to be a place of public accommodation).
In denying the applicability of the statute, the Veterans contend that theirs is a private parade. I disagree. As in Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination, 402 Mass. 716, 721 (1988), the lack of genuine selectivity in choosing participants and sponsors demonstrates that the Parade is a public event. The following participants and/or sponsors were featured in the 1992 Parade: Patriot Missile Raytheon Corporation, Hallamore Clydesdale Horses, 98.5 Mix FM Radio Van, Boston Municipal Police Department, Irish Basketball Players, South Boston Resident Group, MBTA Color Guard, Vehicles and McGruff the Crime Dog, South Boston Against Drugs (“SOBAD”) float, Marion Manor Seniors float, National Parks Service Rangers and Vehicles, South Boston Baptist Bible Trolley float, Vietnam Era Veterans, Princeman Singing Group, Leukemia Society, City Councillors Rosaría Salerno, Albert “Dapper” O’Neil and John Nucci, WZOU 94.5 FM Trolley float, Houlihan’s, Amrheims and Irish Mist Restaurants, Shuberts Smoke Shop, Hub Video, Miss South Boston, Miss Ice-O-Rama and Miss Jr. Ice-O-Rama, Lexington Minutemen, AFhCIO Trolley float and marchers, various high school bands, NORAD (Irish Northern Aid), Massachusetts Citizens for Life, Salem N.H. Joey Clowns, WZLX FM, WAAF FM Rock Bus, and others. The 1993 Parade featured many of the same participants and sponsors, as well as the Boston Bruins, MASSPORT, Budweiser, Mt. Washington Bank, Pepsi, various candidates for city council, various state representatives and senators, the Cycling Murrays, Citizens Committee for JFK Day, Massachusetts Water Pollution Control Association, South Boston Savings Bank, all declared and undeclared mayoral candidates in Boston, and others. Put differently, the interests and viewpoints represented are truly catholic: commercial (Budweiser), religious (Southie Baptists), political (Councillor O’Neil), elee *373 mosynary (Leukemia Society), patriotic (Vietnam Veterans), moral (Massachusetts Citizens for Life), theatrical (Joey Clowns), athletic (Boston Bruins), public service (Massport), trade union (AFL-CIO), and so on. Indeed, since 1947 the only groups that have been excluded from the Parade besides GLIB have been the Ku Klux Klan and ROAR (Restore Our Alienated Rights).[7] Neither of these groups, however, is protected under M.G.L.c. 272, §§92A and 98.
The Veterans Council has no written procedures, criteria, or standards for selecting participants or sponsors. Applications for participation in the next year’s Parade are sent to all previous participants. Those who call to inquire about participating in the Parade are sent applications, and depending upon the monies available they are reimbursed for their travel expenses or costs of performance. Applications from new groups are voted on in batches,[8] and the Veterans do not generally inquire into the specific messages or views of each applicant.
In addition, some groups participate in the Parade without submitting an application to the Veterans Council. For instance, in 1993, the Boston Bruins did not apply to the Veterans Council, but simply showed up at the Parade and marched. Other groups gained entrance by making a contribution to the Parade rather than filling out an application form.[9] Thus, the procedures for admittance into the Parade are not uniformly applied.
Moreover, South Boston’s St. Patrick’s/Evacuation Day Parade is a public celebration of longstanding. It celebrates both St. Patrick’s Day and Evacuation Day. Evacuation Day, which also falls on March 17, commemorates General Washington’s initial military victory over the British in 1776, and the British departure from South Boston. Exh. 92. It is an officially recognized historical event in Massachusetts and a Suffolk County holiday.[10]
During the first half of this century, the South Boston Citizens Association and the City of Boston organized the various Evacuation Day activities. In 1901, the City celebrated the 125th anniversary of Evacuation Day by a parade, artillery salute, concert, and fireworks display, among other events. In 1947 Mayor James Michael Curley granted the Veterans Council authority to organize and conduct the Parade. [11] Since that time, the City has annually granted the Veterans a parade permit.[12] No other applicant has applied for the permit.
Over the years, the Parade has featured as many as 20,000 participants and as many as 1,000,000 spectators. In 1992, the Parade featured about 10,000 participants and 750,000 spectators. The 1993 Parade, postponed due to inclement weather, had fewer than 10,000 participants, about 400,000 spectators, and was aired live by Boston’s community access cable television channel. The Parade is one of the six largest parades held in Boston annually, and the largest New England event for Irish-Americans, their friends, and well-wishers.
Given the lack of selectivity exerted by the Veterans over the Parade participants and sponsors, as well as the Parade’s historical roots, I conclude that the Parade is a public event. Concord Rod & Gun Club, Inc. v. Massachusetts Cornmission Against Discrimination, 402 Mass. 716, 721 (1988). As such, I find that the Parade constitutes a public accommodation within the meaning of M.G.L.c. 272, §92A. Consequently, the Veterans’ exclusion of GLIB based on the sexual orientation of its members violates the public accommodations statute.
By its terms, M.G.L.c. 272, §98 also forbids aiding or inciting discrimination based on sexual orientation in places of public accommodation, resort or amusement, and GLIB alleges that the City by its conduct has violated the statute. Did the City’s involvement in the 1993 Parade constitute aiding or inciting the Veterans in their violation of GLIB’s rights under the public accommodations statute?[13]
The following facts were adduced at trial. The City, through the BTD, provides services for the six largest parades in Boston: posting “no parking” signs along the route, ticketing and towing vehicles along the route, and occasionally erecting barriers or roping the route. The City also provides myriad services through the Office of Business and Cultural Development to any parade sponsors at their request. These services include the use of the City’s printing services and planning and organizational assistance. Additionally, the City provides police, fire, emergency, and public works services to every parade or function in the City comparable to the Parade.
Although the City’s involvement dates back to the Parade’s beginning, over the years the City has divorced itself from the Parade. Thus for the 1993 Parade, the City’s involvement consisted of the participation of city vehicles such as fire, ambulances, and police in the Parade itself. The City also supplied clean-up services for the 1993 Parade costing a total of approximately $8,000. This amount is comparable to other parades of similar size.[14] Many of these services constitute routine functions of government. See Otway v. City of New York, 818 F.Supp. 659, 664 (S.D.N.Y. 1993) (providing police and sanitation services for parade are a legitimate governmental function and do not constitute the establishment of religion in violation of the First Amendment).
In mid-November of 1992, GLIB notified the Mayor of its intention to march in the 1993 Parade. On the same day, Richard A. Dimino, Commissioner of the BTD, wrote to the Veterans asking them to submit their 1993 permit application by mid-December and asking whether they planned to abide by the 1992 court order. The Veterans refused to state whether they would comply with the 1992 order and demanded that the BTD immediately issue the 1993 permit.
*374 In determining whether to issue a permit, the City-may consider only time, place, manner, and public safety. See Cox v. New Hampshire, 312 U.S. 569, 576 (1941).[15] The City may not consider either the content or subject matter of the speech in its decision to grant a permit. Consolidated Edison Co. of N.Y. v. Public Service Comm’n of N.Y., 447 U.S. 530, 536 (1980).
For while a municipality may constitutionally impose reasonable time, place, and manner regulations on the use of its streets and sidewalks for First Amendment purposes . . . and may even forbid altogether such use of some of its facilities .. . what a municipality may not do under the First and Fourteenth Amendments is to discriminate in the regulation of expression on the basis of the content of that expression .' . . Above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.
Hudgens v. National Labor Relations Board, 425 U.S. 507, 520 (1976) (internal quotations and citations omitted).
Sensing its dilemma, the City turned to the court for guidance; it moved for clarification as to whether the 1992 order also applied to the 1993 Parade. That motion was denied. Irish American Gay, Lesbian & Bisexual Group of Boston v. City of Boston, C.A. No. 92-1518 (Suffolk Super. Ct. Dec. 11, 1992, Zobel, J.).
On December 16, 1992, the BTD contacted the Veterans by a letter stating that “as a public official, the Commissioner is mindful that the parade organization and conduct are subject to anti-discrimination laws which extend to many protected characteristics including sexual orientation, as set forth in Chapters 151B and 272, Sections 92 and 98, of the General Laws.” Exh. 11. On December 23, 1992, the BTD issued to the Veterans a conditional permit for the 1993 Parade, requiring the Veterans to cooperate with the Boston Police Department in devising a public safety plan for the Parade in the event that the court ordered GLIB’s participation. The Veterans complied with this condition and on February 16, 1993, the City granted the Veterans a permit for the 1993 Parade. On February 19, 1993, the court granted GLIB a preliminary injunction enjoining the Veterans from excluding GLIB from the 1993 Parade.
GLIB contends that the City’s actions in granting the Veterans a permit, knowing that the Veterans intended to exclude GLIB from the Parade in violation of the public accommodations statute, amounts to a violation of M.G.L.c. 272, §98. Additionally, GLIB argues that by falling to enforce the public accommodations law, the City aided the Veterans in their violation of M.G.L.c. 272, §98. Although the clause of the relevant statute relating to liability for aiding or inciting discrimination in a place of public accommodation has not been interpreted by our appellate courts, I hold that the City’s actions do not rise to that criminal statutory level of assistance or incitement.
While the City could have required the Veterans to promise to admit GLIB into the Parade in compliance with the public accommodations law, see Healy v. James, 408 U.S. 169, 193 (1972) (college administrator could constitutionally require group seeking official university recognition to affirm in advance its willingness to abide by reasonable campus laws), the applicability of the public accommodations statute was in dispute at the time. See South Boston Allied War Veterans Council v. The Honorable Hiller B. Zobel, C.A. No. 93-10509-WF (D.Mass. March 11, 1993, Wolf, J.) (questioning applicability of M.G.L.c. 272, §98 to parades). Although the City is obliged by its own ordinances not to discriminate in places of public accommodations on the basis of sexual orientation, Boston City Ordinances c. 16, §406 (1984), it is likewise prohibited from abridging the First Amendment rights of its citizens, which the Veterans claimed to be exercising. Hudgens v. National Labor Relations Board, 425 U.S. 507, 520 (1976). Therefore, while I conclude that the City’s inaction was discreditable, it was not aiding or inciting under M.G.L.c. 272, §98.
The most that can be said of the City’s conduct is that it allowed the Veterans to hold a parade, for without a permit a parade is not lawful. But issuing a parade permit is a neutral act. Otway v. City of N.Y., supra at 662. Moreover, the City did not encourage, assist, or act in cooperation with the Veterans in their attempt to discriminate against GLIB. As in cases discussing “aiding” in terms of accomplice liability, there must exist a “purposive attitude toward” accomplishing the result. United States v. Peoni, 100 F.2d 401, 402-03 (2d Cir. 1938); see also Commonwealth v. Raposo, 413 Mass. 182, 185 (1992) (discussing accomplice liability). GLIB has failed to demonstrate that the Ciiy intended to facilitate the discrimination against GLIB by granting the Veterans a permit. See Invisble Empire of the Knights of the Ku Klux Klan v. Thurmont, 700 F.Supp. 281, 287 (D.Md. 1988) (granting of parade permit and police presence does not constitute state espousal of discriminatory policies). To the contrary, the City’s then Mayor attempted to persuade the Veterans to allow GLIB to march. Under these circumstances, it cannot be said that the City aided or incited the Veterans in violating GLIB’s rights under M.G.L.c. 272, §98.
GLIB also challenges its exclusion from the Parade on the ground that such action violates its members’ constitutional rights of freedom of expression and association and denies them equal protection of the laws as guaranteed by the First and Fourteenth Amendment to the United States Constitution. A finding of state action is necessary to implicate these federal constitutional guarantees. See, e.g., San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 542 (1987) (fundamental *375 inquiry focuses on whether a governmental actor is involved to implicate constitutional prohibitions); Rendell-Baker v. Kohn, 457 U.S. 830, 837 (1982) (First and Fourteenth Amendments apply to acts of the state, not to the actions of private individuals or entities); Lugar v. Edmonson Oil Co., Inc., 457 U.S. 933, 936 (1982) (state action requirement reflects fact that constitutional rights are protected only against governmental infringement). Thus, we must determine whether the City’s involvement in the Parade is sufficient to establish the requisite state action so as to implicate the United States Constitution. See Phillips v. Youth Development Program, Inc., 390 Mass 652 (1983) (discussing state action requirement).
GLIB seeks injunctive relief, so while the City’s role in the 1992 Parade is relevant and admissible as evidence, its current and prospective participation is more significant.[16] Assuming that the Parade began as a civic celebration, the present question is whether the City has sufficiently disengaged itself from the Parade to negate a finding of state action.[17]
Various activities that are ostensibly private have been found by different analyses to be state action for constitutional purposes. Elections to public office are governmental functions that can not be put out of the Constitution’s reach. Terry v. Adams, 345 U.S. 461 (1953). Private use of state processes or mechanisms may be state action. Batson v. Kentucky, 476 U.S. 79 (1986) (racially discriminatory jury challenges); Shelley v. Kraemer, 334 U.S. 1 (1948) (state enforcement of private racially restrictive covenants). Private discrimination may become state action when it is implemented by public authorities. Evans v. Newton, 382 U.S. 296 (1977) (cify operation of privately donated racially segregated park). A typically private enterprise is subject to constitutional requirements where it maintains a mutually dependent relationship with the state. Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961) (privately owned restaurant in a City-owned parking garage).
In asserting its constitutional claims here, GLIB contends that the City is inextricably intertwined in the sponsorship and planning of the Parade so as to require a finding of state action. In so concluding, GLIB relies on Evans and Burton, above. Additionally, GLIB argues that while parades are not traditionally a governmental function, this Parade is such.
The Cify maintains that its participation does not amount to state action as that concept is now defined by the Supreme Court. Predictably, the Veterans go farther: They argue that the only state action here is the City’s attempt to interfere impermissibly with their private Parade.
The City is correct that the Supreme Court has narrowed the state action doctrine since the days of Evans and Burton.[18] But that truism does not decide this case. The relevant questions here are: Is this Parade a governmental function that has been delegated to the Veterans to perform; is the Parade a typically private function, but one so suffused with Cify participation as to transform it into a state action event; is the Parade a state mechanism or process which the Veterans seek to use; is there a mutually dependent relationship between the City and the Veterans’ enterprise?
First, organizing or running a celebratory parade is not traditionally a governmental function in the sense of conducting a public election or running a town. Marsh v. Alabama, 326 U.S. 501 (1946); Phillips v. Youth Development Program Inc., 390 Mass. 653, 654-55 (1983). And the Veterans are not clothed with official authority to enable them to stage the Parade. Moreover, the Parade is a public event in the sense that it serves its spectators by entertaining them, but that does not make it state action. Rendell-Baker v. Kohn, 457 U.S. 830, 842 (1982).
Second, a typically private event or activity may be state action where it is so extensively sponsored, regulated, and sometimes financed by the state that its choices must fairly be said to be made by the public authorities or required by them. Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). GLIB maintains that such an elaborate financial and regulatory nexus is the case here.
In support of its nexus argument, GLIB points to the following facts. Up through the 1992 Parade, the Cify provided the use of its official seal, printing services, and direct funding to participants and sponsors.[19] Until 1993, the City provided approximately twenty-five percent of the Parade’s total costs through the Office of Business and Cultural Development. The Cify also identified and contacted potential participants and disseminated information regarding the Parade. These actions, however, do not differ from the assistance the City offers other parade organizers. Cify monies are also available for other events and parades as well. Indeed, the City points out that its involvement here is less than it is in some other comparable events. The Veterans’ Chief Marshal applies for this parade permit, whereas the Independence Day Parade is a Cify event for which the Cify or one of its departments secures the permit. Exh. 85, 86.[20]
The focus in this inquiry is not on the overall relationship between the City and the Veterans, but rather on the City’s involvement in the Veterans’ decision to exclude GLIB. Phillips v. Youth Development Program, Inc., 390 Mass. 652, 655 (1983). That the Cify granted the Veterans a parade permit does not render the Veterans a government actor. See San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 543 (1987) (Congress’s grant of a corporate charter to Committee did not make the Committee a governmental agent); Invisible Empire of the Knights of the Ku Klux Khan v. Thurmont, 700 F.Supp. 281, 287 (D.Md. 1988) (police presence and granting parade permit does not constitute state espousal of discriminatory practices); Gay Veterans *376 Ass’n, Inc. v. American Legion, 621 F.Supp. 1510, 1517 (S.D.N.Y. 1985) (issuing a parade permit does not amount to state action). Here, the City opposed the Veterans’ discrimination, at least rhetorically, but even acquiescence in the Veterans’ discriminatory actions does not rise to the level of state action. Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). It can not be said that the City’s regulatory scheme in issuing parade permits encouraged the Veterans to exclude GLIB from the Parade. Blum v. Yaretsky, 457 U.S. 991, 1004 (1982) (state will be held responsible for a private decision only when it provides coercion or significant encouragement); accord Ponce v. Basketball Federation of Commonwealth of Puerto Rico, 760 F.2d 375, 378 (1st Cir. 1985); Phillips v. Youth Development Program, Inc., 390 Mass. 652, 655 (1983).
While a financial nexus may be indicative of state action, the City’s financial involvement here does not warrant such a finding. While the Veterans decided which bills to submit to the City for the reimbursement of the various marching groups for the 1992 Parade, the City paid the requested amounts directly to the participants and/or sponsors after the Parade. These contributions of the City prior to the 1993 Parade are insufficient to establish the required nexus where the City’s financial support in no way encouraged or compelled the Veterans to exclude GLIB from the Parade. Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). Additionally, although the City made funds available to reimburse Parade participants and sponsors for the 1993 Parade, none were used. Moreover, the Mayor’s reception to raise funds for the Veterans does not transform a public event into a state action event. See San Francisco Art & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 544 (1987) (government may subsidize private entities without constitutional responsibility attaching). GLIB’s inability to identify any action by the City which in fact motivated the Veterans’ private discriminatory actions precludes a finding of state action under the nexus approach. See Ponce v. Basketball Federation of the Commonwealth of Puerto Rico, 760 F.2d 375, 378 (1st Cir. 1985) (failure to point to specific governmental actions motivated private actors discriminatory conduct fatal to constitutional claim).
Third, it cannot be said that there is state action here because the Parade is a governmental mechanism which the Veterans seek to make an instrument of discrimination. Compare Batson v. Kentucky, above. The Veterans do not seek to involve the Cify in their decision to exclude GLIB and, as noted above, the Parade is not a state-created mechanism or procedure.
Finally, state action will be found where there exists a “symbiotic relationship” between the government and the private actor. Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F.Supp. 65, 72 (D.Mass. 1990). The Court has described a symbiotic relationship as one of interdependence and joint participation. Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961).
In support of its state action argument, GLIB notes that the Chief Marshal and Parade Adjutant for the 1992 Parade were Cify employees.[21] The evidence reveals that becoming Chief Marshal is a process of "coming up through the ranks," and the Chief Marshal then selects the Parade Adjutant. With respect to the 1992 Parade, the Veterans Council elected Thomas J. Lyons, a cify employee, as the Chief Marshal. Lyons designated Gene J. Vaillancourt, another city employee, to be the 1992 Parade Adjutant.[22] Vaillancourt conducted his duties of organizing the parade primarily before or after work, and on the weekends. GLIB contends that the activities of these individuals leads to the conclusion that the state is inextricably involved in the Parade. I find, however, that Lyons’s election had nothing to do with his status as a cify employee.[23] Neither Lyons’s nor Vaillancourt’s involvement in the Parade constitutes any participation on the City’s part, and I so find.
The most important factor in this type of state action is the extent to which the Cify derives an economic benefit from the Veterans’ discrimination. Rendell-Baker v. Kohn, 457 U.S. 830, 843 (1982); Ponce v. Basketball Federation of the Commonwealth of Puerto Rico, 760 F.2d 375, 382 (1st Cir. 1985); Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F.Supp. 65, 73 (D.Mass. 1990); see also Burton v. Wilmington Parking Authority, 365 U.S. 715, 724 (1961) (finding a direct economic relationship between restaurant’s discriminatory policies and State’s financial position). With respect to the 1993 Parade, the Cify set aside $9,000 from its public celebrations budget. Exh. 87. The Veterans did not submit any bills to the Cify for reimbursement.[24] The Veterans did not use the City’s printing services or request any assistance from the Office of Business and Cultural Development in obtaining marchers for the 1993 Parade. The Boston Public Works Department erected a set of bleachers to serve as a reviewing stand along the parade route, various police, fire, and emergency service vehicles and personnel participated in the Parade, and the City provided police and sanitation services. But those amenities did not profit the Cify.
After the Veterans publicly announced that they would not use public monies to help finance the 1993 Parade, the Mayor hosted a reception in honor of the Parade Committee. The reception was held at a city-owned facility and the Cify printed the invitations which contained the official Cify seal. Suggested donations for attendance were $25 per person. Although the amount of monies collected as a result of this event are not in evidence, approximately 200 people attended the event. The Mayor collected contributions for the Veterans Council before, during, and after the reception which he then turned over to the Veterans. In addition, some contributions were sent directly to the Veterans Council.
*377 As set forth above, the City issued the Veterans a conditional parade permit requiring the Veterans to cooperate in the development of a public safety plan in the event that the court mandated GLIB’s participation. The City also sought judicial clarification of the 1992 court order in connection with the 1993 Parade. Most notably, the Boston Police Department determined GLIB’s placement in the 1993 Parade processional after GLIB received a preliminary injunction requiring its inclusion. Irish American Gay, Lesbian & Bisexual Group of Boston v. City of Boston; C.A. No. 92-1518 (Suffolk Super. Ct. Feb. 19, 1993, Zobel, J.).
Unlike Burton, above, in which “profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency,” 365 U.S. 715, 724 (1961), no such financial benefit to the City has been demonstrated here. Rather, as noted above, the City has expended monies on the Parade prior to 1993. Furthermore, the contributions the Mayor’s reception raised for the Parade were in the form of checks made out to the Veterans Council, not the City. This can be contrasted with a city-run event, such as First Night perhaps, in which the City provides entertainment to those who purchase tickets directly from the City.
Moreover, if a symbiotic relationship actually existed, the City would not have been able to remove itself from the Parade without discontinuing the Parade altogether. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 725 (1961) (finding of state action justified where the state is in a position of interdependence with the private entity). Even if the City’s involvement in the Parade prior to 1993 could establish the requisite state action, the City has sufficiently removed itself from the Parade business so as to negate any such finding. Consequently, I find no symbiotic relationship exists between the City and the Veterans.
Accordingly, I find that the City’s involvement in the Parade does not amount to state action. I also find that the Veterans’ council did not act on behalf of the City, but instead acted as a private party. Since the conduct of private parties is beyond the Constitution’s scope, GLIB’s constitutional claims must fail. San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 547 (1987); Rendell-Baker v. Kohn, 457 U.S. 830, 837 (1982); Phillips v. Youth Development Program, Inc., 390 Mass. 652 (1982).[25]
GLIB’s constitutional arguments (post-trial memorandum, pp. 17-27) appear to assume that the Massachusetts Constitution, like the federal Constitution, protects their activities against state action interference only, not against private interference. That limitation upon the reach of the Commonwealth’s Constitution’s protections is questionable. Batchelder v. Allied Stores International, Inc., 388 Mass. 83, 88-93 (1983); O’Connell v. Chasdi, 400 Mass. 686, 693-94 (1987). Also questionable is whether the Articles relied on by GLIB, one and sixteen, prohibit public or private sexual orientation discrimination. In any event, I do not reach those issues because the statute, M.G.L.c. 272, §§92, 98A, clearly applies here. Similarly, because I find that this Parade is not a state action event, I do not decide whether the discrimination here offends the Fourteenth Amendment.
Because I find that the public accommodations statute applies to the Parade, the next question is whether the statute as applied in the circumstances of this case abridges the Veterans’ First Amendment rights. The Veterans argue that their Parade is a form of speech protected by the First Amendment via the Fourteenth Amendment, and that their speech will be effectively diluted or distorted if they are required to include GLIB in their Parade.
The First Amendment protects two types of association from governmental interference. Roberts v. United States Jaycees, 468 U.S. 609, 617 (1984). First, it protects an individual’s right to enter into and maintain certain intimate or private relationships against unjustified governmental interference. Id. at 617-18; Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537; 544 (1987); Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination, 402 Mass. 716, 721 (1988). This right is not at issue here.[26] Second, the First Amendment also protects the right of expressive association. It is this right that the Veterans claim would be unconstitutionally burdened by application of the public accommodations statute.
The right of expressive association protects individuals’ freedom to associate for the purpose of engaging in protected speech or religious activities. Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 544 (1987); Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination, 402 Mass. 716, 721 (1988). This right necessarily includes the freedom not to associate. Abood v. Detroit Board of Education, 431 U.S. 209, 234-35 (1977). Where an association “is organized for a specific expressive purpose and ... it will not be able to advocate its desired viewpoints nearly as effectively if it cannot confine its membership to those who share the same sex, for example, or the same religion,” a nondiscrimination condition may unconstitutionally infringe on the right of expressive association. New York State Club Ass’n, Inc. v. City of New York 487 U.S. 1, 13 (1988); see also Invisible Empire of the Knights of the Ku Khxx Khan v. Thurmont 700 F.Supp. 281, 289 (D.Md. 1988). Where, however, the association consists of “(sjtrangers to one another . . . and [the association] . . . admits all who are willing to pay the admission fee, . . . such a coming together to engage in [a] recreational [activity] ... is not protected by the First Amendment.” Dallas v. Stanglin, 490 U.S. 19, 25 (1989).
In the instant case, the Parade is more akin to a “social association.” See Dallas, above. Participation in the Parade is not limited on the basis of similarity *378 of viewpoints. The Parade celebrates a public holiday, and it is composed of diverse groups espousing myriad themes and values. The Parade is eclectic in every sense. It includes patriotic, commercial, political, moral, artistic, religious, athletic, public service, trade union, and eleemosynary themes. In fact, some of the messages expressed in the Parade contradict those espoused by other participants. For example, Gillette, a non-union company participated, as did the AFL-CIO. Moreover, some AFL-CIO marchers carried signs which read “Boycott Miller Beer,” conflicting with the various sponsoring bars and pubs who sell such products. The only common theme among the participants and sponsors is their public involvement in the Parade. Indeed, the Veterans’ position is paradoxical: A proper celebration of St. Patrick’s and Evacuation Day requires diversity and inclusiveness; an assertion of a right of expressive association requires focus on a specific message, theme, or group — perhaps a temple or parish congregation. See, e. g., New York County Bd. of Ancient Order of Hibernians v. Dinkins, 814 F.Supp. 358, 367 (S.D.N.Y. 1993) (finding the New York St. Patrick’s Day Parade conveyed a distinct message: proclaiming allegiance to the Roman Catholic Church and honoring the patron saint of Ireland). The Veterans have always opted for heterogeneousness. Given the Veterans’ lack of selectivity in choosing participants and failure to circumscribe the marchers’ messages, it is impossible to discern any specific expressive purpose entitling the Parade to protection under the First Amendment.
Even if the statute does work some slight infringement on the Veterans’ right of expressive association, that infringement is justified by the State’s interest in eradicating sexual orientation discrimination. Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 549 (1987); Roberts v. United States Jaycees, 468 U.S. 609, 623 (1984). On its face, the statute does not seek to suppress speech. Rather, its goal is to eliminate discrimination which is unrelated to the suppression of expression. Board of Directors of Rotary International v. Rotary Club of Duarte, 481 U.S. 537, 549 (1987); Roberts v. United States Jaycees, 468 U.S. 609, 624 (1984). Moreover, the Veterans’ right of expressive association is not unduly burdened by the statute’s restriction. The statute does not mandate GLIB’s inclusion into the Parade; it only prevents GLIB’s exclusion simply because of its members’ sexual orientation. Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination, 402 Mass. 716, 722 (1988). Consequently, any incidental abridgement of the Veterans’ speech is no greater than necessary to accomplish the statute’s legitimate purpose. Roberts v. United States Jaycees, 468 U.S. 609, 628-29 (1984). Accordingly, I rule that the nondiscrimination condition imposed by the public accommodations statute does not violate the Veterans’ right to expressive association.[27]
In seeking permanent injunctive relief, GLIB asks that the court not renew the conditions on its participation which accompanied the preliminary injunction of February 22, 1993.[28] GLIB’s participation in the 1992 and 1993 Parades was peaceable and orderly. Moreover, except for reiterating unsubstantiated concerns, neither the Veterans nor the City has shown that conditions applicable only to GLIB should be imposed.[29] Of course, GLIB is not entitled to special benefits, but neither should it be subject to special burdens. Therefore I hold that GLIB is entitled to participate in the Parade on the same terms and conditions as other participants. See Invisible Empire of the Knights of the Ku Klux Klan v. Thurmont, 700 F.Supp. 281, 285-86 (D.Md. 1988) (enjoining the imposition of conditions on KKK march where no evidence of disruption by marchers).
In their cross-claim against the City, the Veterans allege that by seeking judicial clarification of the prior court order for the 1993 Parade, and by conceding the applicability of certain anti-discrimination laws, the City violated the Veteran’s rights to freedom of speech, association, assembly, free exercise of religion, and equal protection of the laws in violation of the First and Fourteenth Amendments to the United States Constitution, and Articles 1, 12, 16 and 19 of the Massachusetts Declaration of Rights (Count I). Furthermore, the Veterans contend that the City’s initial rejection and subsequent delay in issuing the Veterans a parade permit, along with the City’s aforementioned actions, interfered with the Veterans’ constitutional rights in violation of M.G.L.c. 12, §§11H and 1II (Count II). The Veterans seek a permanent injunction prohibiting the City from attempting to control the content of the Veterans’ speech embodied in any future parades.
As explained above, the Veterans’ Parade is not an exercise of their constitutionally protected right of expressive association. It is an open recreational event that is subject to the public accommodations law. Therefore, the City’s gestures toward compliance with that law did not violate the constitutional rights of the Veterans. Similarly, with respect to M.G.L.c. 12, §§11H and 1II, the Veterans do not have a right to exclude GLEB that is “secured by the constitution or laws of the United States, or . . . the commonwealth.” Therefore, the Veterans do not have a claim against the City for interference with their exercise of such a right. Moreover, even if the Veterans were correct about their rights, the City’s mistake of law about GLIB’s rights and those of the Veterans would not constitute the “threats, intimidation or coercion” proscribed by the Massachusetts Civil Rights Act, c. 12, §11H. Layne v. Superintendent, 406 Mass. 156, 158 (1989).
In summation: The Veterans’ exclusion of GLIB from the St. Patrick’s/Evacuation Day Parade violates M.G.L.C. 272, §§92A and 98, the public accommodations law; absent state action, the exclusion does not violate GLIB’s rights under the federal Constitution; *379 the broadly inclusive Parade is not constitutionally protected expressive association; the Veterans’ cross-claims that the City has violated their constitutional and statutory rights are meritless; GLIB’s motion for an order authorizing its participation in the Parade subject to generally applicable terms and conditions will be allowed.
History does not record that St. Patrick limited his ministry to heterosexuals or that General Washington’s soldiers were all straight. Inclusiveness should be the hallmark of their Parade.
ORDER
For the foregoing reasons, it is hereby ADJUDGED that the defendant Veterans Council violated the plaintiffs’ (GLIB’s) rights to be free from sexual orientation discrimination in a place of public accommodation, resort, or amusement in violation of M.G.L.c. 272, §§92A and 98. It is therefore DECREED that the defendant Veterans Council is permanently enjoined from preventing plaintiff GLIB from participating in the St. Patrick’s/Evacuation Day Parade because of the group members’ sexual orientation. The preliminary injunction issued on February 22, 1993 is hereby DISSOLVED. The plaintiff may submit a proposed permanent injunction, preferably by agreement as to form. It is further ORDERED that the defendant Veterans Council shall allow plaintiff GLIB to participate in the Parade in the same manner and under the same terms and conditions applicable to all other participants in the Parade.

 Cindy Toombs and Ellie Rudolph.

 Irish American Gay, Lesbian & Bisexual Group of Boston v. City of Boston, CA. No. 92-1518 (Suffolk Super. Ct., March 11, 1992) (Zobel, J.).

 Hurley speaks for the Veterans Council and he testified on its behalf. He indicated that the objection to GLIB’s participation was based on the belief, although unsubstantiated, that its members were also members of ACT-UP and Queer Nation. The group’s potential for being disorderly was offered as a reason for excluding it. The defendant’s final position was that GLIB would be excluded because of its values and its message, i.e., its members’ sexual orientation. Tr. of Closing Arg. pp.43, 51-52 (Nov. 23, 1993).

 Several cases, although they are distinguishable on other grounds, illuminate the invalidity of the Veterans’ purported reasons for excluding GLIB. Excluding all sexual themes not only contravenes the First Amendment’s prohibition on content-based restrictions, see Consolidated Edison Co. of N.Y. v. Public Service Comm’n of N.Y., 447 U.S. 530, 537-38 (1980) (prohibiting discussion of an entire topic violates the First Amendment), but is a form of discrimination itself. See Loving v. Virginia, 388 U.S. 1, 8 (1967) (rejecting notion that equal application of miscegenation statutes did not constitute invidious racial discrimination). Consequently, the Veterans’ exclusion of GLIB under the guise of excluding all groups with sexual themes violates the public accommodations law’s prohibition on sexual orientation discrimination. Moreover, denying GLIB’s participation because some of its members might be associated with a radical group assumes guilt by association but is not proof of disruptiveness. See Healy v. James, 408 U.S. 169, 189-91 (1972) (assumed association with national group advocating violence did not constitute evidence that local group would be disruptive). The record demonstrates no basis for concluding that GLIB’s participation would incite imminent lawlessness. Brandenburg v. Ohio, 395 U.S. 444, 447 (1969). Just as undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of expression, see Tinker v. Des Moines Independent School Dist., 393 U.S. 503, 508 (1969), the Veteran’s denial of GLIB’s application due to the purported association of some of its members would not withstand scrutiny under the statute.

 The Veterans denied ROAR permission to participate based on its anti-busing message.

 Regardless of the formality of a vote by the Veterans Council, I find that the decision on participation (when there is a decision, see infra} is made by the defendant Hurley. Whether the Veterans Council genuinely votes or merely rubber-stamps Hurley’s decision is immaterial because on the question of GLIB’s participation Hurley and the Veterans Council are of one mind.

 Participants not filling out application forms included the Massachusetts Water Pollution Control Association, newly declared mayoral candidates, and others.

 The General Court of Massachusetts established Evacuation Day in 1938. See M.G.L.c. 6, §12K. It is a paid holiday for city employees and a holiday for Boston Public Schools. A variety of activities take place from March 1 to March 17 to celebrate Evacuation Day, including a boxing show, the Ice-O-Rama, a basketball freethrow contest, historic and memorial exercises, a swimming event, an Irish forum, among others.

 The Veterans Council is an unincorporated association, consisting of members who are elected from various South Boston Veterans of Foreign Wars, American Legion, and Disabled Veterans Posts.

 The City of Boston Transportation Department (BTD) has authority to issue permits for all parades within the City of Boston. Parades are lawful only if the BTD has issued a permit for it. Acts, 1929, c. 263, §2 as amended; Rules and Regs, of BTD, Art. VIII, §1 as amended through Jan. 2, 1988. Neither the BTD nor the city charge a fee for parade permits.

 The City’s involvement in the 1992 Parade is not before this court as the plaintiffs failed to file a complaint before the Massachusetts Commission Against Discrimination. Since violations of the public accommodations law fall within the purview of M.G.L.c. 15 IB, §5, the filing of a prior complaint with the MCAD is a jurisdictional prerequisite that cannot be waived. See Ackerson v. Dennison Mfg. Co., 624 F.Supp. 1148, 1150 (D.Mass. 1986) (jurisdictional requirement cannot be waived); East Chop Tennis Club v. Massachusetts Comm’n Against Discrimination, 364 Mass. 444, 446 (1973) (G.L.c. 272, §98 falls within the ambit of G.L.c. 151B, §5).

 In 1993, the Bunker Hill Day Parade route cost $9,369.91 to clean, while the Columbus Day and Dorchester Day Parades cost $6,189.23 and $7,815.38 respectively.

 Acts, 1929 c. 263, establish the Boston-Traffic Commission and define its powers. The BTD has its own mies and regulations as well which set forth other considerations. See BTD, Rules and Regs., Art. VUI, §2(a) and (b).

 The City’s involvement in the 1992 Parade would present a closer question as to state action, but it is not before me here.

 The plaintiff does not argue that the Parade is immutably public. GLIB concedes that the Parade could be privatized; it argues that the City has not done so.

 One commentator has recently put it as follows: “Moose Lodge [v. Irvis, 407 U.S. 163 (1972)] marked a significant contraction of the state action doctrine. The Supreme Court has consistently rejected invitations to jettison the doctrine by overruling the Civil Rights Cases and has insisted that state action is present only when private parties perform customary governmental functions, or when the state has required or actively encouraged the challenged private conduct, or when that conduct may be attributed to a state official orto a party acting in concert with state officials.” Porter, State Action, The Oxford Companion to the Supreme Court of the United States 823 (Hall, ed. New York, 1992).

 Similar amenities are available to all parades of comparable size.

 Evidence was not offered about the December 12, 1993, Sleigh Bell Parade, which may have been an enterprise of the Boston Convention & Visitation Bureau. Boston Globe, December 13, 1993, p.19.

 The Chief Marshal and Parade Adjutant are in charge of organizing the Parade.

 At this time, Lyons was the Deputy Commissioner of Veterans Affairs for the City. Vaillancourt was an employee of the Veterans Affairs Department of the City.

 Prior to Lyon’s election, a city employee had not been elected to the position of Chief Marshal in 40 years.

 The same amount was set aside for the 1992 Parade. Exh. 87. The budget for fiscal year 1994 does not contain any provision for the 1994 Parade. Exh. 88.

 It must be emphasized that this finding in no way immunizes the City against a different result should it undertake (or resume) greater participation in the Parade.

 The right of intimate association refers to those relationships that presuppose “deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one’s life.” Roberts v. United States Jaycees, 468 U.S. 609, 620 (1984). Contact between the Veterans and the various participants is casual, often occurring at best a few times a year and usually only in reference to the Parade. Indeed, no argument has been made that the Veterans share personal aspects of their lives with the various participating groups or sponsors.

 This is not to say, however, that the Parade can never become a protected First Amendment activity. It simply has not been one in the past and is not one now.

 The conditions were:
1. No more than twenty-five (25) individuals (“the Group”) will march.
2. Each such individual shall wear a readily identifiable badge or insignia indicating membership in the Irish-American Gay, Lesbian and Bisexual Group of Boston, which insignia shall be made known to the parade authorities and the Boston Police officer in charge of parade security no less than five (5) hours before the scheduled start of the parade.
3. All terms and conditions with [sic] bind all other parade participants shall bind the group.
4. The group shall display a single cloth banner carried at waist level.
5. The group’s members shall carry no placards or posters other than the banner nor any other written material.
6. No group member, individually or in concert with any other or others, shall distribute by any manner or means any pamphlet, object or material of any kind whatsoever.
7. The group shall cooperate with and obey the appropriate orders of any Boston Police Department officer on duly in or about the vicinity of the parade.
8. All members of the group shall conduct themselves in a peaceful and orderly manner, with due regard for the public’s safety.
9. Violation of any of the foregoing terms will constitute grounds for an automatic and immediate revocation of the right to march of both the individual or the group as a whole.
10. Any dispute with respect to any term of this Order shall be decided on the spot by the Officer in Charge of the Community Disorders Unit of the Boston Police Department or his designated representative: and if he designates a representative, such designee is to be made known no later than five hours before the scheduled start of the Parade to Plaintiffs Timothy Daley and/or Cathleen Finn and to Defendant John J. Hurley (and/or his designated representative).
Irish-American Gay, Lesbian and Bisexual Group of Boston v. City of Boston, Civ. No. 92-1518A (Suffolk Super. Ct. Feb. 22, 1993, Zobel, J.).

 The disruption caused by spectators cannot be a basis for refusing GLIB’s request. See Patmore v. Sidoti, 466 U.S. 429, 433 (1984) (“Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect”): Invisible Empire of the Knights of the Ku Klux Klan v. Thurmont, 700 F.Supp. 281, 285 (D.Md. 1988).